KARL STEDING *v.* HARRY BATTISTONI

APPELLATE DIVISION OF THE CIRCUIT COURT

FILE No. CV 17-639-1908

Argued September 14—decided October 30, 1964

*Monroe S. Gordon,* of New Britain, for the appellant (defendant).

*Howard R. Steeg,* of Bristol, for the appellee (plaintiff).

JACOBS, J. The complaint alleged that "on or about August 16, 1963, the defendant, without the knowledge or consent of the plaintiff and for his own personal advantage and gain caused an action to be commenced in the name of the plaintiff and others against three property owners in the Lake Garda area";[1] that the "action was commenced and instituted by the defendant falsely and maliciously representing to the issuing authority that he had secured approval, authorization and consent of the plaintiff to institute such action when in fact he had received none"; and, "as a result of the defendant's actions, the plaintiff's right of privacy was invaded, he was ridiculed, embarrassed, scorned, suffered in his reputation and good name and his character has been injured." The defendant's answer amounted to a general denial. The jury awarded the plaintiff

[1] In the action of *Steding* v. *Landry,* returnable before the Court of Common Pleas to be holden at New Britain, in and for the County of Hartford, on the first Tuesday of October, 1963, the plaintiffs sought to enjoin the defendants from obstructing Beach Road and Lakeview Street, located in the Lake Garda section in the towns of Burlington and Farmington, and, in addition to injunctive relief, claimed damages for $2500 and such other and further relief as the court may deem proper. After the action was commenced by service of the process upon the defendants, but before it was returned to court, Monroe S. Gordon, an attorney, by letter dated August 26, 1963, notified all parties in interest that "[i]n view of the telephone call from Mr. Karl Steding, . . . I am withdrawing suit against Eugene Landry."

damages in the amount of $2500. The court accepted the verdict. Judgment was rendered accordingly.

The recognition of the right of privacy in this state has not been questioned by the defendant. See *Korn* v. *Rennison,* 21 Conn. Sup. 400 (unauthorized publication of the plaintiff's photograph);[2] Prosser, Torts § 112, p. 831, n.21 (1964). It has been said that a person's name is rarely protected per se; Feinberg, "Recent Developments in the Law of Privacy," 48 Colum. L. Rev. 713, 723; that is to say, "that a person has no such exclusive right to the use of his own name as to prevent the assumption of its use by another." *Hinish* v. *Meier & Frank Co.,* 166 Ore. 482, 501; *Brown Chemical Co.* v. *Meyer,* 139 U.S. 540, 544. When the question of the use of another's name has been posed, some other interest is usually involved; it is "the standing of the personality in the eyes of third persons." Green, "The Right of Privacy," 27 Ill. L. Rev. 237, 243. A person's name is a symbol of his existence, and it is through it that he is known to the world. See 1 Harper & James, Torts § 9.6 (1956). "Nothing so exclusively belongs to a man or is so personal and valuable to him as his name. His reputation and the character he has built up are inseparably connected with it. Others can have no right to use it without his express consent, and he has a right to go into any court at any time to enjoin or prohibit any unauthorized use of it. Nor is it necessary that it be alleged or proved that such unauthorized use will damage

---

[2] This case was decided by Superior Court Judge Howard W. Alcorn (as he then was) on November 12, 1959. Judge Alcorn documented his opinion with many of the leading authorities and concluded (p. 403): "No case decided within the last fifteen years has been found in which the existence of a right of privacy has been denied." As Professor Prosser aptly demonstrates, "[n]o other tort has received such an outpouring of comment in advocacy of its bare existence." Prosser, Torts § 112, p. 830 (1964); see 1 Harper & James, Torts § 9.6 (1956).

him. This the law will presume." *State ex rel. La-Follette* v. *Hinkle,* 131 Wash. 86, 93.[3]

In the *Hinish* case, supra, the defendants, without the plaintiff's knowledge or consent, signed the plaintiff's name to a telegram which they sent to the governor of the state of Oregon. The telegram urged the veto of a bill passed by the Oregon legislative assembly which would have prevented the defendants from continuing the practice of optometry. The court held (p. 506) "that the complaint plainly states a cause of action for the breach of the plaintiff's right of privacy." Thomas A. Edison, the world-renowned inventor, sued to enjoin the use of his name and was granted a decree where it was shown that the defendant came into possession of a medicinal preparation compounded by Edison and used, without Edison's permission or consent, the name "Edison's Polyform" on the labels attached to the bottles. *Edison* v. *Edison Polyform & Mfg. Co.,* 73 N.J. Eq. 136. President Emeritus Eliot of Harvard University was granted injunctive relief when he had at no time given his consent to the use of his name by the defendants in the advertisement and sale of books. *Eliot* v. *Jones,* 66 Misc. 95, aff'd, 140 App. Div. 911 (N.Y.). Mary Garden, the famous opera singer, enjoined the use of her name in the advertisement and sale of perfume. *Garden* v. *Parfumerie Rigaud, Inc.,* 151 Misc. 692, 693 (N.Y.) (holding "it cannot be denied that her name and her portrait are her own and during life solely at her

---

[3] The court in this case made no mention of the right of privacy. The facts, briefly stated, were these: Senator LaFollette was at that time a candidate for president of the United States. The court held that he was entitled to a writ of mandamus prohibiting the secretary of state from certifying certain candidates for state offices under nominations made by a self-styled "La Follette State Party," where the use of his name in connection with the local ticket was contrary to his wishes and was alleged to be prejudicial to his candidacy. The court ordered the name "LaFollette" stricken from the name of the local political party.

disposal"). Less prominent figures have been equally successful in preventing the unauthorized use of their names. See *Uproar Co.* v. *National Broadcasting Co.,* 8 F. Sup. 358, modified on other grounds, 81 F.2d 373 (use of a man's name without his consent on a radio program); *Goodyear Tire & Rubber Co.* v. *Vandergriff,* 52 Ga. App. 662 (defendant's agent telephoned a competitor, identifying himself as the plaintiff in order to learn confidential prices); *Magouirk* v. *Western Union Telegraph Co.,* 79 Miss. 632 (another's name used as a signature to a telegram); *Schwartz* v. *Edrington,* 133 La. 235 (publication of the plaintiff's name on list of petitioners for incorporation of a village). These decisions recognize that the right to be let alone—the right of an inviolate personality—is just as much a right as the right not to be assaulted and beaten, the right not to be falsely imprisoned, the right not to be maliciously prosecuted, and the right not to be defamed.

So, in the case before us, in finding the issues for the plaintiff, the jury must have found that what the defendant did, without the plaintiff's knowledge or consent and against his will, was to appropriate to himself, for his own personal advantage and gain, the use of the plaintiff's name, his personality and whatever standing he possessed in his community, and to inject it into a legal controversy in which, so far as appears, the plaintiff had no interest. This was not the mere incidental use of the plaintiff's name;[4] it was meaningful and purposeful. It was an unseemly and unbecoming intrusion into a

---

[4] "What! Are they to be allowed to use the name of any person they please, representing him as responsible in their speculations, and to involve him in all sorts of liabilities, and are they then to be allowed to escape the consequences by saying they have done it by inadvertence? Certainly not." Lord Langdale, Master of the Rolls, in *Routh* v. *Webster,* 10 Beav. 561, 563, 50 Eng. Rep. 698; see *Walter* v. *Ashton,* [1902] 2 Ch. 282.

man's privacy. See, generally, notes, 138 A.L.R. 22, 168 A.L.R. 446, 14 A.L.R.2d 750.

Only two assignments of error are pursued in the defendant's brief. The court, it was, claimed, committed harmful error in permitting "the testimony of Monroe S. Gordon, an attorney at law, as to confidential communications between [him and the] defendant." It seems strange to us that, upon this record, such a claim should be so strenuously pressed. In his assignment of errors, under "Part C," relating to "errors and rulings in the conduct of the trial," a portion of the transcript in the form of an exhibit is made part of the record on appeal. In our examination of the exhibit, which is needlessly long and difficult to follow, we fail to see that the attorney-client relationship ever existed between the defendant and Gordon.[5] Moreover, even if such a relationship were shown to have existed, the plaintiff was merely attempting to show by the question objected to the identity of the real party in interest in the litigation to which we have referred.[6] "The identity of the attorney's client or the name of the *real party in interest* will seldom be a matter communicated in confidence because the procedure of litigation ordinarily presupposes a disclosure of these facts. . . . Every litigant is in justice entitled to know the identity of his opponents. He cannot be obliged to struggle in the dark against unknown forces. . . . On the other hand, the litigant is not entitled to ask any more than serves to fix the *client's*

---

[5] The defendant's exhibit discloses the following: "The Court: You feel there has been an attorney and client relationship here between Attorney Gordon and Battistoni? Mr. Kremski [trial counsel]: Only insofar as mentioned here, as an agent for, as an officer of the corporation, or the association, not between Attorney Gordon and Mr. Battistoni individually. . . . All Mr. Battistoni said he never hired, he went on for some length, he never hired Mr. Gordon in a personal capacity, but he did hire him as an officer of the corporation."

[6] See note 1 supra.

*identity."* 8 Wigmore, Evidence § 2313 (McNaughton Rev. 1961). This is all the plaintiff attempted to establish, nothing more.

The remaining assignment of error is that the court erred in accepting the verdict because it was excessive. We point out that the record discloses that the defendant filed no requests to charge and took no exceptions to the charge as given. Practice Book § 249. In these circumstances, "[s]ince no assignment of error is addressed to the charge, we must assume it was adequate and legally correct." *Vogel* v. *Sylvester,* 148 Conn. 666, 668, and cases there cited. Nor did the defendant move to set aside the verdict. See General Statutes § 52-225; Practice Book §§ 254, 800. Under our practice, the trial court has the inherent power to set aside the verdict, even though no motion has been made; *Belchak* v. *New York, N.H. & H.R. Co.,* 119 Conn. 630, 637; Maltbie, Conn. App. Proc. §§ 181, 198; "but if it does so, it should require that a motion be filed, though it be after its action, for the rules for appeals from rulings as to setting verdicts aside are adapted only to situations where a motion has been made and ruled upon." Maltbie, op. cit. § 181. Had the defendant desired to raise the issue of the propriety of the verdict, he should have moved to set it aside, which he did not do. See *Marcil* v. *Merriman & Sons, Inc.,* 115 Conn. 678, 680. In the absence of such a motion, the question is not reviewable on appeal.

There is no error.

In this opinion DEARINGTON and KINMONTH, Js., concurred.